Cite as 2024 Ark. App. 318

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CR-23-688

| | | |
|---|---|---|
| MARSHAY WAYNE | APPELLANT | Opinion Delivered May 15, 2024 |
| V. | | APPEAL FROM THE UNION COUNTY CIRCUIT COURT [NO. 70CR-21-330] |
| STATE OF ARKANSAS | APPELLEE | HONORABLE JIM ANDREWS, JUDGE |
| | | AFFIRMED |

**CINDY GRACE THYER, Judge**

A Union County jury convicted Marshay Wayne of one count of trafficking a controlled substance (methamphetamine); one count of trafficking a controlled substance (cocaine); and one count of maintaining drug premises. She appeals those convictions, claiming that there was insufficient evidence to support her convictions and that the court committed an evidentiary error by allowing the admission of hearsay evidence. We affirm.

On May 8, 2021, approximately thirteen pounds of methamphetamine and three pounds of cocaine were found stored in a nonfunctioning dryer on the back porch of a trailer owned by James Lester and rented by Marshay Wayne. As a result of this discovery, Wayne was subsequently charged with one count of trafficking a controlled substance (methamphetamine); one count of trafficking a controlled substance (cocaine); and one count of maintaining drug premises.

Trial occurred on June 5, 2023. At trial, the State called Lester, an army veteran and retired accountant from Murphy Oil, as its first witness. Lester testified that he owned rental property with three trailers on it, and he rented one of the trailers to Wayne on a month-to-month basis. The other trailers were vacant. He testified that Wayne paid her rent on time each month and in cash. Wayne was the sole tenant on the lease.

Lester testified that, on the day the drugs were discovered, he and his property manager, Bernard Hollands, went to Wayne's trailer to fix her air conditioner. While there, they decided to haul the nonfunctioning dryer from the back porch to a scrap yard. Lester stated that Wayne had called him a couple months prior to remove the dryer, but he simply had not gotten around to doing so. That day, he decided to kill two birds with one stone while he was there—repair the air conditioner and remove the dryer.

When they went to move the dryer, they opened it and looked inside. He stated he was not exactly sure what they had found in the dryer. Because Wayne was out of town, they called her sister. After that, they called the police.

Hollands was the next to testify. He testified that he is a retired special education teacher. He stated that, on the day the drugs were discovered, he had gone to the property to work on one of the air-conditioning units. Lester went with him so he could access the trailer in the event the tenant was not at home.

After he fixed the unit, Hollands and Lester decided to haul off a dryer stored on the back porch. Hollands testified that he already had a scrap pile of stuff he intended to sell

2

and wanted to add the dryer to his pile. He backed his truck up to the porch, and he and Lester attempted to move the dryer.

Because the dryer seemed heavier than normal, they decided to empty it. Inside the dryer, Hollands found baby clothes and a "sandwich bag." He held the baggie up to the sun and then googled the substance inside. His search indicated the substance was "crystal meth."

After the discovery, Hollands and Lester loaded the dryer onto the truck and called Lester's wife, Judy. Judy attempted to call Wayne, but when she could not reach her, she called Wayne's sister. Wayne's sister and mother came to the house, and Hollands informed them they had found drugs in the dryer on the back porch. Wayne's sister again tried to reach Wayne by phone and was finally able to do so. Hollands told them they wanted Wayne to remove the drugs because drugs were not allowed on the premises. He stated they did not want anyone to get into trouble, they just wanted whoever owned it to come and get it. Wayne stated that she would return home. No one claimed ownership of the drugs.

At that point, Hollands called a friend who worked for the sheriff's department and informed the friend that they had found drugs in the dryer. The sheriff's department sent a deputy out to retrieve the drugs. The deputy collected the drugs and then asked Lester and Hollands to follow him to the police station to get their fingerprints to eliminate them as suspects. When they reached the station, two inmates came out, unloaded the dryer, and placed it on the ground. Hollands was allowed to leave once that was done.

Hollands also described the porch on which the dryer and drugs were found. He stated that the porch was lined with a mattress and an old baby bed. He explained that it was kind of like a storage building but was not a building.

Captain Eric Meadows was the next witness. He testified that, on May 8, 2021, he was dispatched to Lester's property to investigate some drugs found at the residence and to collect evidence if needed. The property was in a rural area, and it was open on both sides.

When he arrived on scene, he contacted Hollands. Meadows then explained that Hollands had told him that he had been there to do some work, that he was attempting to remove a dryer that had been there for approximately three months, and that he had found the drugs when he took items out of the dryer to make it lighter. Counsel, however, interrupted his testimony and objected on hearsay grounds before Meadows could finish his explanation. The court overruled the objection but instructed the jury that his comment was not evidence.

Meadows then explained that he saw a dryer sitting on the back of a Ford F150 truck. The door to the dryer was open, and Meadows could see several Ziploc bags inside and some baby items. Meadows stated that he realized at that point what it was and began to take pictures and collect the evidence.

He testified that he discovered large gallon-size bags of a crystal-like substance he believed to be methamphetamine. He stated there were probably fifteen or sixteen bags of that substance in the dryer and that he had never seen that many bags before. He stated that there were also bags containing a white powdery substance he believed to be cocaine. He

stated that the drugs were packaged individually and that all of them were about equal in size and weight. It was the largest quantity of drugs he had ever seen. Because he was unsure whom the drugs belonged to, he was nervous and had his head on a swivel because he was afraid the owners might come back to reclaim their property.

After photographing the dryer and the drugs, Meadows had Hollands show him where on the porch the dryer had been located so that he could take pictures of the area as well. He saw several rolls of duct tape, consistent with the tape on the bagged drugs, and several clear nonlatex or latex gloves and tools.

Meadows then described the layout of the porch. He testified that there were several pieces of furniture lining the walls as if to conceal the porch so you could not see onto it. He further testified that you could not see the porch from the road. In his opinion, the location could be considered a "stash spot."

The photographs he took that afternoon, including the picture of the porch, and his body-cam video were admitted into evidence. The video, including the audio portion, was played for the jury.

Austin McQuistion, an investigator for the Union County Sheriff's Office, testified he conducted an interview with Wayne. After reading Wayne her *Miranda* rights, Wayne agreed to speak with him. Wayne stated that she and her two children, aged seven months and two years, lived at the address where the drugs were found and had lived there for a little over a year. She indicated she ran a catering or baking business out of her home.

As for the dryer, she stated that the dryer had been inside the home when she moved in but that it quit working, and she moved it to the back porch when she purchased a new dryer. She then contacted her landlord to remove it. She offered no explanation as to how the drugs ended up in the dryer on her porch and denied leaving any clothes in the dryer when it was moved outside. When asked if there were any other persons—family members or friends—who frequented her home on a regular basis that might be responsible for leaving the drugs there, she did not offer any names. Wayne was taken into custody immediately after the interview.

Investigator McQuistion was then shown a close-up photograph of one of the bags containing the suspected cocaine. He stated that it appeared to be vacuum sealed and wrapped with some sort of clear tape and placed in a gallon Ziploc bag. On the package were stamps or markings similar to what the cartels use to put their brand on the packaging.

As for the quantity of drugs found, McQuistion stated there were fifteen Ziploc bags containing suspected methamphetamine weighing approximately 6200 grams and two Ziploc bags containing suspected cocaine weighing approximately 1300 grams. He estimated that, at between $50 and $100 a gram, the methamphetamine was worth somewhere between $310,950 and $621,900. Likewise, the cocaine was worth between $65,500 and $131,000. As with Officer Meadows, he testified that this was the largest quantity of methamphetamine he had ever encountered. It was his understanding that both substances tested positive for methamphetamine and cocaine respectively.

Investigator McQuistion then testified that other items found on the porch were sent for fingerprint and DNA analysis. However, they obtained only one fingerprint result off of a black roll of Gorilla Tape. That fingerprint matched the fingerprint of an individual from the Rio Grande area in Texas who, to his knowledge, had no other ties to the area.

He then professed his opinion that the Wayne residence was a "stash house"; that is, a residence or structure used for the sole purpose of storing narcotics in a safe place where it was not likely to be tampered with by the police or others. The individual who stored the drugs later retrieves the drugs when needed for a particular sale. He based his opinion on the quantity of drugs found and the fact that some of the baggies appeared to have been opened. He also believed the drugs were not locally sourced due to the quantities involved and probably came across the border from Mexico. A subsequent search of Wayne's house revealed no further contraband.

Parker Beaupre, a forensic chemist with the DEA, testified that the fifteen Ziploc bags contained 6,219 grams[1] of 100% (+/- 6 %) pure methamphetamine. Erin Schaeffer, another forensic chemist with the DEA, testified that the other substance was 1,310.2 grams[2] of cocaine.

After hearing all the evidence, the jury returned a verdict of guilty on all counts. Wayne now appeals, claiming that there was insufficient evidence to support her convictions

---

[1] 6,219 grams is approximately 13.7 pounds.

[2] 1,310.2 grams is approximately 2.89 pounds.

7

and that the court committed an evidentiary error by allowing the admission of hearsay evidence.

I. *Sufficiency of the Evidence*

When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State, and only the evidence supporting the verdict will be considered. *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002). A conviction is affirmed if substantial evidence exists to support it. *Id.* Substantial evidence is evidence forceful enough to compel a conclusion beyond suspicion or conjecture. *Id.*

A. Trafficking

Wayne first challenges her trafficking convictions. As charged in this case, a person engages in trafficking of methamphetamine or cocaine if he or she possesses more than 200 grams of the drug, including any adulterant or diluents. Ark. Code Ann. § 5-64-440(b)(1) (Supp. 2023).

At issue in this appeal is whether the State offered sufficient evidence to prove that Wayne "possessed" the methamphetamine and cocaine. Under Arkansas law, possession may be established by proof of actual possession or constructive possession. *Martin v. State*, 2019 Ark. App. 509, 587 S.W.3d 623. Wayne's conviction was premised on constructive, rather than actual, possession.

Constructive possession is the control of or right to control the contraband. *Matlock v. State*, 2015 Ark. App. 65, 454 S.W.3d 776. Constructive possession may be established by circumstantial evidence and can be inferred where the contraband is found in a place

8

immediately and exclusively accessible to the defendant and subject to his control. *Szczerba v. State*, 2017 Ark. App. 27, 511 S.W.3d 360. However, while constructive possession may be established by circumstantial evidence, when such evidence alone is relied on for conviction, it must indicate guilt and exclude every other reasonable hypothesis. *Davis v. State*, 2023 Ark. App. 133, 661 S.W.3d 738. Whether circumstantial evidence excludes every other reasonable hypothesis is a decision for the fact-finder; but when the evidence leaves the fact-finder to speculate and conjecture, a conviction cannot stand. *Bradley v. State*, 2018 Ark. App. 586, 564 S.W.3d 569.

Here, Wayne was the only adult renter of the property in question; she lived in the trailer with her two-year-old and seven-month-old children. As the sole adult tenant of the property, she had exclusive dominion and control over the premises. Moreover, the dryer in question was located on her back porch, which, although not completely enclosed, was surrounded by mattresses and furniture such that the interior of the porch was not readily visible to the outside. The following photographs of the porch were submitted to the jury:

 

Additionally, the quantity of drugs discovered in the dryer implied the possession was for resale and not simply personal consumption; thus, indicating the need for repeated access to the dryer. The evidence further reflected that, while the porch could potentially be accessed by others without entering the home, Wayne worked from home, and it was unlikely strangers would repeatedly access the porch without her knowledge. Moreover, the dryer contained not only the drugs but baby clothing as well.

While Wayne argues on appeal that there are multiple other persons who could have accessed the porch and the drugs, including the property owner and his handyman—the persons who contacted the police—the jury was not required to believe these assertions. In fact, it stretches credulity to conclude that they would have contacted the police and surrendered approximately $375,000 to $750,000 worth of their own product. Nor was there any evidence that Wayne's family, her ex, or some other random person hid such a substantial quantity of drugs in a dryer on her porch without her knowledge. Nor is it plausible that they would assume the risk of her subsequently finding the stash, especially given the need to repeatedly access the drugs at that location.

B. Maintaining Drug Premises

Wayne also argues that the evidence was insufficient to support her maintaining-drug-premises conviction. It is unlawful for any person "knowingly to keep or maintain any store, shop, warehouse, dwelling, building, or other structure or place or premise that is resorted to by a person for the purpose of using or obtaining a controlled substance in violation of this chapter or that is used for keeping a controlled substance in violation of this chapter."

Ark. Code Ann. § 5-64-402(a)(2) (Repl. 2016). Wayne argues, as she does above, that the State failed to prove that she constructively possessed the drugs; thus, the State cannot prove that she knowingly maintained the premises for the purposes of keeping the controlled substances. Her argument fails for the same reasons it fails with respect to her trafficking convictions.

She further argues, for the first time on appeal, that a single act of possession cannot constitute "maintaining" drug premises. At trial, defense counsel argued:

> On maintaining a drug premises, the State failed to prove that, one, my client even knew that there were drugs anywhere around her. So just that aspect alone, her having no knowledge of drugs being there or anybody bringing drugs to and from there. There's nothing in her conduct that would show that she knew about it and there's no action taken by my client to show that she had any knowledge of the drugs, and the State did not even make a prima facie case of that.

> The best they made was the investigator saying, well, I think she did it because she's there, she works from home—a lot of people worked from home during the pandemic—and whomever was doing it was taking smaller quantities from large quantities. . . . That's the closest thing that I—in other words, I assume it was her because of the proximity to her home. It was her old washer and who else would do it? That's the State's case on her running a drug premises.

Arguments not raised at trial will not be addressed for the first time on appeal, and parties cannot change the grounds for an objection on appeal but are bound by the scope and nature of the objections and arguments presented at trial. *Branch v. State*, 2024 Ark. App. 193. Because Wayne failed to argue in her directed-verdict motion that a single act of possession cannot constitute "maintaining" drug premises, her argument is not preserved for appeal. *Id.*

C. *Bradley v. State* Mandates Reversal

11

She next argues that *Bradley v. State*, 2018 Ark. App. 586, 564 S.W.3d 569, mandates a reversal. She is incorrect. *Bradley* involved contraband found in a backyard. At the time of the arrest, multiple adults and teenagers were present and had access to the contraband. Thus, this was a true joint-occupancy situation—Bradley did not have exclusive dominion or control over the area. Here, because Wayne was the sole adult tenant, there was sufficient evidence to find that she had exclusive control over the area.

Nor does our opinion in *Lucas v. State*, 2023 Ark. App. 306, 669 S.W.3d 266, mandate reversal. In *Lucas*, the contraband was found in an unlocked truck located on Lucas's father's property near a public road. The owner of the truck was never identified, and the keys were not found on Lucas's person. Lucas was simply found asleep nearby and had been seen driving the truck on a previous occasion. We held that there was simply no evidence that the truck was in Lucas's sole, exclusive possession. Again, here, Wayne was the sole adult tenant. The drugs were found on her property, in her dryer, on her porch. This fact scenario is strikingly different than the scenario in *Lucas*.

## II. *Hearsay Testimony*

Wayne's final argument is that the circuit court erred in allowing Officer Meadows to testify as to what Hollands told him. At trial, Meadows testified that, when he contacted Hollands at the scene, Hollands informed him that he was there to do some work and that he had removed a dryer from the back porch that had been there for approximately three months. When he began to testify that he took some items out of the dryer to make it lighter, counsel objected on hearsay grounds. The court allowed the testimony, finding that it was

12

introduced to explain the basis for Meadows's investigation. Although the court overruled Wayne's objection, the court instructed the jury that Hollands's statements were not evidence.

Arkansas Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." An out-of-court statement is not hearsay, however, if it is offered, not for the truth of the matter asserted, but to show the basis of action. *Green v. State*, 2024 Ark. App. 126, at 13, 685 S.W.3d 294, 302. Here, the statement was not hearsay because it was used to explain Officer Meadows's actions in searching the dryer.

Even if the statements were deemed inadmissible hearsay, their admission was harmless. First, Wayne did not object to the admission of the same evidence as introduced in the audio portion of the body-cam footage. Additionally, Hollands's testimony at trial confirmed what Officer Meadows stated. This court will not reverse an evidentiary ruling absent a showing of prejudice. *Sauerwin v. State*, 363 Ark. 324, 214 S.W.3d 266 (2005). Evidence that is merely cumulative or repetitious of other evidence admitted without objection cannot be claimed to be prejudicial. *Gonzales v. State*, 306 Ark. 1, 811 S.W.2d 760 (1991). Because this evidence is repetitious of other evidence admitted without objection, it is not prejudicial.

Second, the court informed the jury that the statement itself was not evidence, thereby, in essence, offering a limiting instruction to the jury. We have observed that a limiting instruction or admonishment by the court may serve to remove the prejudicial effect

of evidence. *Kilpatrick v. State*, 322 Ark. 728, 912 S.W.2d 917 (1995). Indeed, we have held that an admonition will usually remove the effect of a prejudicial statement unless the statement is so patently inflammatory that justice could not be served by continuing the trial. *Kimble v. State*, 331 Ark. 155, 959 S.W.2d 43 (1998). Thus, the court's admonition, under these circumstances, essentially removed any prejudicial effect the introduction of Hollands's statements might have had.

For the foregoing reasons, we affirm.

Affirmed.

BARRETT and BROWN, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.